**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **MODERN FONT APPLICATIONS LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | **6:21-CV-470-ADA** |
| **v.** | § | |
| | § | |
| | § | |
| **RED LOBSTER HOSPITALITY LLC,** | § | |
| *Defendant.* | § | |
| | § | |

## MEMORANDUM IN SUPPORT OF CLAIM CONSTRUCTION ORDER

On January 26, 2022, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 9,886,421 ("the '421 Patent"). Plaintiff Modern Font Applications LLC ("Plaintiff") accuses Defendant Red Lobster Hospitality LLC ("Defendant") of infringing claims 1, 3, 4, and 6-11 of the '421 Patent. Defendant filed an opening claim construction brief (Dkt. No. 26), to which Plaintiff filed a responsive brief (Dkt. No. 27), to which Defendant filed a reply brief (Dkt. No. 28), to which Plaintiff filed a sur-reply brief (Dkt. No. 29). The parties additionally provided a Joint Claim Construction Statement (Dkt. No. 30).[1] Having considered the parties' arguments from the hearing and those presented in their claim construction briefs, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues a Claim Construction Order concurrent with this memorandum. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] Citations to the parties' claim construction briefs and Joint Claim Construction Statement are to the Case Management/Electronic Case Files (Dkt. Nos.) and pin cites are to the pagination assigned through ECF.

1

## I.     OVERVIEW OF THE PATENT

The '421 Patent, titled "Allowing Operating System Access To Non-Standard Fonts In A Network Document," issued on February 6, 2018 and claims priority to an earlier application filed July 16, 2001.  At a high level, the '421 Patent relates to the field of computer font technology. '421 Patent at 1:25-26.  More specifically, the patent relates to methods, systems, and computer program products for allowing characters of fonts that are not standard to a computer operating system ("OS") to be displayed and/or otherwise used by the OS of the computer.  *Id*. at 1:27-30.

The '421 Patent describes that display of "non-standard fonts"[2] with conventional computing techniques has been problematic.  '421 Patent at 1:54-67.  The patent explains that electronic documents on a reader's computer are typically displayed using only the fonts that are currently loaded on the reader's computer.  *Id*. at 1:57-60.  In such cases, the operating system of the reader's computer may replace "unknown fonts" with "known fonts" when displaying the electronic document.  *Id*. at 1:64-67.  This results in display of the electronic document in a form different than that originally created by the author.  *Id*. at 1:60-64.  The patent explains that what is needed to address this problem are "methods, systems, and computer program products for allowing characters of fonts that are not standard to an operating system of a reader's computer to be conveniently used by the operating system to facilitate viewing, copying, pasting, printing, and/or editing of the characters in different applications."  *Id*. at 2:54-59.  The Abstract of the '421 Patent states:

> When a browsing computer navigates to a network document, such as a web page, the corresponding server also downloads computer readable formatting information necessary for the operating system of the browsing computer to render correctly any characters within the network document even if the fonts associated with those

---

[2] The parties have agreed to construe "non-standard font" to mean "fonts that are not loaded on the handheld device and thus the corresponding characters cannot be displayed or otherwise used by the operating system."  Dkt. No. 30 at 2.

characters do not exist on the browsing computer prior to encountering the network document. An exposure module is also downloaded to the browsing computer. The exposure module is loaded onto the browsing computer, which in turn either permanently installs or temporarily exposes the operating system of the browsing computer to the computer readable font formatting information associated with the network document. As a result, the operating system of the browsing computer is able to display or otherwise process the network document correctly and consistently regardless of the computer readable fonts installed on the browsing computer.

'421 Patent at Abstract.

Representative independent claim 1 of the '421 Patent is reproduced below with its disputed term in italics:

1. A non-transitory computer-readable medium adapted for use with a computer coupled to a network such that select information on the non-transitory computer-readable medium is accessible by a *hand-held device* having an operating system and coupled to the network, the non-transitory computer-readable medium including:

an electronic file package including a plurality of display characters and *computer executable instructions* for identifying the plurality of display characters for display and for identifying one or more external *fonts* used to render at least one of the plurality of display characters;

a *font package* comprising one or more external *font files* that include formatting information necessary for the *hand-held device* to render the at least one of the plurality of display characters using the one or more identified external fonts, the *font package* separate from the *computer executable instructions* for identifying the plurality of display characters for display; and

an *exposure module* for installation of the one or more external *font files* in a *temporary fonts directory* on the *hand-held device*, the one or more external *font files* being received from the computer responsive to the computer receiving a request for the *font package* from the *hand-held device* so that the *hand-held device* can render the at least one of the plurality of display characters using the one or more external *font files*, whereby when the plurality of display characters are displayed, the plurality of display characters are displayed by a *program module* of the operating system using the one or more external *font files*, wherein in response to the one or more external *font files* being installed, a *system font table* of the *hand-held device* is updated to reflect an availability of the external *font files*.

3

'421 Patent at 15:65–16:32 (emphasis added).

## II.    LEGAL PRINCIPLES

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.  The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent.  *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed.

Cir. 2015).  First, a term's context in the asserted claim can be instructive.  *Phillips*, 415 F.3d at 1314.  Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent.  *Id*.  Differences among the claim terms can also assist in understanding a term's meaning.  *Id*.  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id*. at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Phillips*, 415 F.3d at 1314-15 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex, Inc.*, 299 F.3d at 1325.  But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'"  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.  "[I]t is improper to read limitations from a preferred

embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court has explained the role of extrinsic evidence in claim construction:

In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for

example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015).

### B.     Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[3]  *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

---

[3] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## III.   CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of eleven claim terms in the '421 Patent.

### A.   "hand held device"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| a device designed to be operated while being held in hand | plain and ordinary meaning |

#### 1.   Analysis

The term "hand held device" appears in claims 1, 3, 4, 6, 7, 10, and 11 of the '421 Patent. Dkt. No. 30 at 3.  Plaintiff argues that it proposed a construction in response to Defendant's assertions in preliminary invalidity contentions that the term failed to satisfy written description and enablement requirements, thus rendering the applicable claims invalid.  Dkt. No. 27 at 6. Defendant appears to have shifted course and now contends that the term is understood in accordance with its plain and ordinary meaning.  Dkt. No. 26 at 6 (asserting that "[t]he term 'hand-held device' should be given its plain and ordinary meaning because it is a common term and nothing in the intrinsic record suggests its meaning should be anything other than that commonly understood in the industry"); Dkt. No. 28 at 4 (acknowledging that the "'421 Patent does not use

the term 'hand-held device' in a way that deviates from its plain and ordinary meaning" and that the term "encompasses various types of devices such as personal information managers (PIMs), personal digital assistants (PDAs), and handheld PCs (HPCs)").  The Court agrees.  The Court finds that the term "hand held device" (or "hand-held device," as expressed in the claims) is used in ordinary parlance and that it is readily understood.  The term is therefore construed in accordance with its plain and ordinary meaning.

### 2.  Court's Construction

For the reasons set forth above, the Court finds that the term **"hand held device"** is given its **plain and ordinary meaning.**

### B.    "computer executable instructions"

| Plaintiff's Proposal | Defendant's Proposal |
| --- | --- |
| instructions and/or data that cause the handheld device to perform a certain function or group of functions | plain and ordinary meaning |

### 1.  Analysis

The term "computer executable instructions" appears in claims 1, 6, and 11 of the '421 Patent.  Dkt. No. 30 at 3.  Plaintiff argues that Defendant's proposed "plain and ordinary meaning" construction should be rejected because Defendant actually seeks to import an improper limitation into the claims.  Dkt. No. 27 at 7.  Defendant argues that "computer executable instructions" does not require construction because it is easily understood and requires no further elaboration.  Dkt. No. 26 at 7.

As an initial observation, the Court notes that both parties use the term "computer executable instructions" in various proposed constructions, thus indicating that the term is readily understood and that no construction is required.  *See, e.g.,*  Dkt. No. 30 at 4-5 (Joint Claim Construction Statement: "exposure module" and "program module").  Defendant argues that

Plaintiff's proposed construction is not particularly helpful because it essentially restates the term itself.  Dkt. No. 26 at 7.  The Court agrees.  Moreover, Defendant's proposal substitutes the phrase "instructions and/or data" for the term "instructions."  The Court notes that the claim term is "computer executable *instructions*" not " computer executable *instructions and/or data*."  *See, e.g.,* '421 Patent at 16:15-16 (claim 1 reciting "computer executable instructions for identifying the plurality of display characters for display").  Defendant argues that instructions are distinct from data because instructions must describe an action (e.g., identify display characters), whereas data is simply information (e.g., the display characters themselves). Dkt. No. 26 at 7.  The Court agrees. This understanding is confirmed by the specification, which provides that "[c]omputer-executable instructions comprise, for example, instructions *and* data which cause a general purpose computer, special purpose computer, or special purpose processing device to perform a certain function or group of functions."  '421 Patent at 5:11-15 (emphasis added).

Contrary to Plaintiff's "and/or" proposal, the Court does not agree that the '421 Patent supports a construction of "computer executable instructions" that encompasses data standing alone.  The claim term recites "computer *executable* instructions."  The Court finds that the difference between "instructions" that are "computer executable" and data that is not computer executable is readily understood in the art.  Accordingly, the term "computer executable constructions" should be attributed its plain and ordinary meaning.

### 2.  Court's Construction

For the reasons set forth above, the Court finds that the term **"computer executable instructions"** is given its **plain and ordinary meaning.**

C.    "font"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| one or more characters each having a defined style configuration | plain and ordinary meaning |

### 1.    Analysis

The term "font" appears in claims 1, 3, 4, 6, 10, and 11 of the '421 Patent.  Dkt. No. 30 at 3.  The parties dispute whether the term requires constructions.

Plaintiff argues that its proposed construction should be adopted because it is consistent with how the term is defined and used in the '421 Patent.  Dkt. No. 27 at 8.  Defendant contends that the term "font" requires no construction because there is no indication that the inventor intended to deviate from the term's plain and ordinary meaning.  Dkt. No. 26 at 8.  The Court agrees with Defendant.  The term "font" is well-known in the art to connote design, styling, or configuration that may be *applied* to one or more characters.  *See, e.g.*, Dkt. No. 27-2 at 8 (defining "font" to mean "[a] design for a set of characters").  Plaintiff appears to recognize this distinction when describing the technology disclosed in the '421 Patent.  Dkt. No. 27 at 5 (describing that "the claims of the '421 patent relate to the ability of a user of a handheld device to download and use various types of data that include both text to be rendered in fonts and the fonts themselves").

The principal dispute between the parties appears to be whether the plain and ordinary meaning of "font" applies only to "a set of characters" or applies to "one or more characters."  *See* Dkt. No. 26 at 8 (Defendant arguing that the '421 Patent specification teaches that the plain and ordinary meaning of "font" is a "set of characters"); Dkt. No. 27 at 9 (Plaintiff arguing that the specification makes clear that the term "font" includes the design/style configuration for a single character as well as a set of characters).  The Court finds that "font," as used in the context of the '421 Patent, applies to one character or a set of characters.  This understanding is expressly

contemplated by the '421 Patent.  *See* '421 Patent at 8:23-24 (describing that "as used herein, a 'font' defines one or a group of characters each having a defined configuration").  Having resolved the parties' apparent dispute, the Court finds that the term "font" is attributed its plain and ordinary meaning.

### 2.   Court's Construction

For the reasons set forth above, the Court finds that the term **"font"** is given its **plain and ordinary meaning.**

### D.       "font package"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| This term does not need construction because it is already defined in claim 1 by its components . . . defined in claim 6 by its components . . . and defined in claim 11 by its components . . . .<br><br>Various dependent claims add their own components specific to such claims. | an electronic file that contains one or more font files |

### 1.   Analysis

The term "font package" appears in claims 1, 3, 4, 6, 8, 10, and 11 of the '421 Patent.  Dkt. No. 30 at 4.  Defendant argues that the '421 Patent specification reveals that the inventor intended the term "font package" to have a particular meaning within the context of the '421 Patent.  Dkt. No. 26 at 9.   Plaintiff argues that Defendant's proposed construction seeks to import an unsupported limitation into the claims—requiring the "font package" to be "a file containing files." Dkt. No. 27 at 10.  Plaintiff contends that the term "font package" needs no construction because the applicable features/components of the "font package" are expressly described by the claims in which the term appears.  *Id*. at 10.  The Court agrees with Plaintiff.

As an initial matter, the Court notes that the claims of the '421 Patent draw an apparent distinction between the terms "package" and "file." Claim 1, for example, describes "a font *package* comprising one or more external font *files* that include formatting information necessary for the hand-held device to render the at least one of the plurality of display characters using the one or more identified external fonts." *See* '421 Patent at 16:10-14 (emphasis added). Notably, claim 1 does not limit or describe the "font package" as a "file that contains one or more font files," as proposed by Defendant. Rather, claim 1 describes the "font package" as comprising "one or more external font files." *Id.* at 16:10. Claim 1 further specifies that the "font package" is required to be "separate from the computer executable instructions for identifying the plurality of display characters for display." *Id.* at 16:14-16. Similarly, claim 6 describes the "font package" as "comprising computer readable formatting information for the operating system of the hand-held device to render the at least one display character using the font and for other applications controlled by the operating system of the hand-held device to render the at least one display character using the font." *Id.* at 17:9-15. Claim 6 further specifies that the "font package" is "separate from the application file of the network document" and that the "font package" is "referenced by the computer executable instructions of the network document." *Id.* at 17:6-9. The Court finds that the term "font package," including its applicable features/components, is readily understood by its contextual use in the claims and that the term should be construed in accordance with this plain and ordinary meaning. *Phillips*, 415 F.3d at 1314 (explaining that "the claims themselves provide substantial guidance as the meaning of particular claim terms").

In addition, Defendant's proposed construction, limiting "font package" to "an electronic file that contains one or more font files," is not supported by the '421 Patent specification. While it is true that certain embodiments describe the "font package" in a manner that may comport with

aspects of Defendant's proposed construction (*see, e.g.*, 15:10-13 (describing that "[f]ont package 726 includes one or more font files which contain the formatting information necessary for the creation of the non-standard display characters")), other embodiments describe a "font package" in a broader context. *See, e.g.*, 4:30-32 (describing "a font package containing computer readable formatting information necessary for an operating system to render the corresponding characters"); 8:54-55 (describing "a font package 304 that is incorporated into or linked to network document 202"); 8:56-60 (describing that "font package 304 includes the formatting information necessary for the operating system of browsing computer 204 to generate one or more display characters"). In one example, the '421 Patent discloses that "font package 304 can be created with only font files 312," thus indicating at least in this example that the font package can be something other than "an electronic file that contains one or more font files." '421 Patent 11:14-15.  Moreover, the specification clearly identifies the disclosed embodiment as exemplary and not limiting.  *See, e.g.*, 3:46-48 ("It is appreciated that these drawings depict only typical embodiments of the invention and are therefore not to be considered limiting of its scope."); 3:65-67 ("FIG. 4 illustrates an example . . . ."); 9:16-17 ("By way of example and not by limitation, in one embodiment . . . ."); 10:49-50 ("FIG 4 illustrates one embodiment of a data structure for font package 304."); 15:58-61 (explaining that the disclosed embodiments are "illustrative and not restrictive.").  Thus, it would be improper to narrowly construe the term "font package" based on the disclosed embodiments. *See, e.g., Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 805 F.3d 1102, 1109-10 (Fed. Cir. 2015) (explaining that the Federal Circuit "has repeatedly cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification" and affirming the district court's finding that the specification "does not express any manifest exclusion or restriction as it pertains to specifically to the meaning of 'vision guidance system.'").

### 2.  Court's Construction

For the reasons set forth above, the Court finds that the term **"font package"** is readily understood from its contextual use in the claims and that the term's **plain and ordinary meaning** applies.

### E.     "font file"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| an electronic file having formatting information for one or more characters in a font file format | an electronic file that includes all of the computer readable formatting information necessary for a computer operating system to render one or more display characters |

### 1.  Analysis

The term "font file" appears in claim 1 of the '421 Patent.  Dkt. No. 30 at 4.  Defendant argues that the term "requires construction to inform the jury as to what a POSITA would understand the term to mean.  Dkt. No. 26 at 10.  Plaintiff observes that the parties' proposed constructions overlap to a significant extent.  *See* Dkt. No. 27 at 12 (observing that the parties agree that a "font file" is "an electronic file" that includes "formatting information").  Plaintiff takes issue, however, with the phrase "all of the" in Defendant's proposed construction.  *Id*. Plaintiff argues that this portion of Defendant's proposal is taken from an embodiment disclosed in the '421 Patent specification and that it would be improper to import it into the claims.  *Id*.  The Court agrees.

The Court finds that the meaning of the term "font file" is readily understood from its contextual use in the claims.  Indeed, the parties' proposed constructions are taken almost verbatim from the surrounding claim language.  *See* '421 Patent at 16:10-14 (claim 1 describing "one or more external font files that include formatting information necessary for the hand-held device to render the at least one of the plurality of display characters using the one or more identified external

15

fonts").  Defendant argues that its proposed construction is directly supported by the specification, which describes "each font file 312 includes all of the computer readable formatting information necessary for a computer operating system to render each of the characters associated with the corresponding font file 312."  Dkt. No. 26 at 10 (quoting '421 Patent at 10:8-11).  Notably, claim 1 describes the "font file" in a more general context and does not limit the "font file" to having "*all of the* computer readable formatting information necessary . . . to render each of the characters."  *Id.* (emphasis added).  Rather, claim 1 describes the "font file" only as having "information necessary . . . to render the at least one of the plurality of display characters."  '421 Patent at 16:10-13.  Accordingly, the Court finds Defendant's proposed construction to be overly restrictive and inconsistent with the term's contextual use in claim 1.

Setting aside the phrase "all of the" in Defendant's proposed construction, the parties appear to agree that the term "font file" is understood from its contextual use in claim 1.  As described in claim 1, the Court finds that a "font file" is an electronic file that includes formatting information necessary to render one or more display characters.  '421 Patent at 16:10-14.

### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"font file"** to mean **"an electronic file that includes formatting information necessary to render one or more display characters."**

### F.    "exposure module"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| computer executable instructions to facilitate automatic installation or exposure of the font package | an electronic file comprising computer-executable instructions for installing a separately downloaded font package |

### 1.   Analysis

The term "exposure module" appears in claims 1 and 11 of the '421 Patent.  Dkt. No. 30 at 4.  The parties agree that, in the context of the '421 Patent, the term includes "computer executable instructions" that when executed impose some action on the "font package" recited in the applicable claims.  Defendant proposes that the "exposure module" is limited to "an electronic file" and that the font package must be se "separately downloaded."  Plaintiff argues that Defendant's proposed construction should be rejected because it impermissibly imports unsupported limitations into the claims.  Dkt. No. 27 at 13.  The Court agrees.

Claims 1 and 11 do not impose the "electronic file" and "separately downloaded" requirements included with Defendant's proposed construction.  *See* '421 Patent at 16:17-19 (claim 1 describing "an exposure module for installation of one or more external font files in a temporary fonts directory on the hand-held device"); 18:14-16 (claim 11 describing "the exposure module for automatically installing or exposing the font package to the hand-held device").  Contrary to Defendant's proposed construction, the term-at-issue is "exposure *module*," not "exposure *file*."  The Court notes that claims 1 and 11 use the term "font file," thus suggesting that "module" and "file" are not synonymous.  *See*, *e.g.*, '421 Patent at 16:17-18 (claim 1 describing "an exposure *module* for installation of the one or more external font *files*") (emphasis added).  Moreover, Defendant has not argued that the term "program module" is limited to "an electronic file," thus indicating an apparent understanding that not all "modules" are so limited.  *Infra*. (asserting that "program module" should be construed to have its plain and ordinary meaning).

The specification also uses both "module" and "file" in describing the disclosed embodiments, thus further indicating that the terms are not synonymous.  *See, e.g.*, Abstract ("An exposure module is loaded onto the browsing computer."); 5:19-22 ("[T]he invention will be described in the general context of computer-executable instructions, such as program modules

being executed by computers in network environments."); 8:40-41 ("Examples of such application files include text files, WORDPERFECT files, power point presentation files, and other special application files.").  The Court finds that the different uses of "module" and "file" in both the claims and the specification provide an indication that the term "module" is not limited to an electronic file.  *See, e.g.*, Dkt. No. 27-2 at 13 (describing that "[i]n software, a module is part of a program").  While it may be that the "exposure module" can take the form of a file, the term is not limited, in the context of the '421 Patent, to this particular example.

Setting aside the additional limitations in Defendant's proposed construction, the parties appear to agree that the "exposure module" is computer executable instructions having certain functional capabilities applicable to the font package recited in the claims.  The Court finds that the required functional capabilities of the "exposure module" are expressly described in the claims themselves.  Claim 1, for example, imposes the requirement that the "exposure module" is capable of "installation of the one or more external font files in a temporary fonts directory on the hand-held device."  '421 Patent at 16:17-19.  Claim 11, on the other hand, describes that the functional capabilities of the "exposure module" include "automatically installing or exposing the font package to the hand-held device."  '421 Patent at 18:15-16.

Given the overlapping nature of the parties' proposed constructions and the detailed description provided in claims 1 and 11, the Court finds that the term "exposure module" is understood from its contextual use in the claims and that it should therefore be attributed is plain and ordinary meaning.

## 2.  Court's Construction

For the reasons set forth above, the Court finds that the term **"exposure module"** is given its **plain and ordinary meaning.**

### G.     "temporary fonts directory"

| Plaintiff's Proposal | Defendant's Proposal |
| --- | --- |
| a non-permanent directory for fonts | a location for storing files within the operating system that is erased or becomes inaccessible to the operating system once the computer is shut down or rebooted |

### 1.   Analysis

The term "temporary fonts directory" appears in claims 1, 6, and 11 of the '421 Patent. Dkt. No. 30 at 5.  Defendant takes issue with Plaintiff's proposed construction arguing that it "merely rewords the term by substituting 'non-permanent' for 'temporary,' and as a result leaves out the guidance provided by the specification."  Dkt. No. 26 at 15.  Plaintiff takes issue with Defendant's proposed construction arguing that "Defendant again tries to improperly inject limitations into the claims from example embodiments in the claims."  Dkt. No. 27 at 16.  As with other claim terms, Plaintiff argues that the scope of "temporary fonts directory" is not limited to the embodiments disclosed in the '421 Patent specification.  Dkt. No. 29 at 5.

The Court finds that Defendant's proposed construction should be rejected because it imposes limitations not required by the claims.  Defendant argues that its construction is grounded in the "essential feature" that the temporary fonts directory is "within the operating system."  Dkt. No. 28 at 10.  None of the claims, however, impose this requirement.  Rather, claim 1, for example, specifies that the "temporary fonts directory" is "on the hand-held device."  '421 Patent at 16:18-19; *see also* 17:19-22 (claim 6 describing "a temporary fonts directory on the hand-held device"); 18:20-21 (claim 11 describing "a temporary fonts directory of the hand-held device").  In addition, Defendant's requirement that the "temporary fonts directory" is "erased or becomes inaccessible to the operating system once the computer is shut down or rebooted" is also not imposed by the plain language of the claims.  *Id*.  Rather, the term is self-descriptive regarding the "temporary"

19

nature of the "fonts directory," and the contextual use of the term in the claims makes clear that the fonts directory is for storing font related information, such as "external font files" (claim 1) and the "font package" (claims 6 and 11). *Id.* Therefore, the Court finds that the term "temporary fonts directory" should be construed to mean "a temporary location for storing font related information."

Contrary to Defendant's proposed construction, the specification does not support limiting the term "temporary fonts directory" to the disclosed embodiments. Starting with the location of the "temporary fonts directory," the specification does not require "a location for storing font files within the operating system," as proposed by Defendant. Rather, the specification describes that "the formatting information within font package 304 . . . is either permanently installed on or temporarily exposed to operating system 505." '421 Patent at 13:26-28. The '421 Patent explains that "[t]o facilitate temporary exposure, character objects 603 and font files 312 are copied into a temporary fonts directory 507." *Id.* at 13:49-51. In this regard, the '421 Patent describes several different possibilities for the location of the "temporary fonts directory":

> Temporary fonts directory 507 *may be* located so as not to be directly accessible by a user. *For example*, character objects 603 and font files 312 can be copied into hidden temporary files. Virtual memory mapped files are used to enable operating systems 505 to access the hidden temporary files. *Alternatively*, character objects 603 and font files 312 can also be copied to virtual memory files.

'421 Patent at 13:51-54 (emphasis added). Given the illustrative and permissive nature of these disclosures, the Court finds Defendant's restrictive location of the temporary fonts directory— "within the operating system"—to be unsupported.

Focusing on Defendant's requirement that the "temporary fonts directory" is "erased or becomes inaccessible to the operating system once the computer is shut down or rebooted," the

Court finds that the embodiments relied on by Defendant are described by the '421 Patent as illustrative and non-limiting:

> Temporary fonts directory 507, which contains character objects 603 and font files 312, can be removed or at least become inaccessible through *a variety of different mechanisms*.

'421 Patent at 14:7-10 (emphasis added).  More specifically, the features that Defendant imposes with its proposed construction are disclosed as exemplary of when the "temporary fonts directory" may be erased or otherwise become inaccessible:

> *For example*, installation module 501 *can be* programmed to automatically delete character objects 603 and font files 312 via a JAVASCRIPT.RTM. control when the browser is turned off or when any other predefined act is performed, *such as* closing network document 202 or requesting another web page. Furthermore, due to the volatile nature of hidden temporary files and virtual memory mapped files, these files are either erased or become inaccessible to operating system 505 once browsing computer 204 is shut down or rebooted.

*Id*. at 14:10-19 (emphasis added).  Because the specification describes "a variety of different mechanisms" and circumstances upon which the "temporary fonts directory" may be erased or otherwise become inaccessible, the Court finds that it is improper to limit the term to any particular embodiment disclosed in the '421 Patent.  *Liebel-Flarsheim*, 358 F.3d at 906 (explaining that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expression of manifest exclusion or restriction.") (citation and internal quotation marks omitted).

## 2.  Court's Construction

For the reasons set forth above, the Court finds that the term **"temporary fonts directory"** is construed to mean **"a temporary location for storing font related information."**

21

H.    **"program module"**

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| computer executable instructions for performing a particular task | plain and ordinary meaning |

### 1.    Analysis

The term "program module" appears in claims 1, 6, and 11 of the '421 Patent.  The parties appear to agree that Plaintiff's proposed construction accurately reflects the meaning of the term. Dkt. No. 26 at 15-16 (Defendant asserting that "[t]he plain and ordinary meaning of the term 'program module' is apparent from the claim language and specification" and that Plaintiff's proposed construction "is not incorrect").  The dispute appears to be whether the construction of "program module" should incorporate Plaintiff's proposed construction of "computer executable instructions."  Dkt. No. 28 at 11 (Defendant objecting to Plaintiff's proposed construction because it "incorporates [Plaintiff's] flawed construction of 'computer executable instructions'").

Having addressed the parties' disputes concerning the term "computer executable instructions," the Court finds that construction of "program module" is unnecessary.  Like the term "exposure module," the term "program module" is understood by its contextual use in the claims and should, therefore, be afforded is plain and ordinary meaning.

### 2.    Court's Construction

For the reasons set forth above, the Court finds that the term **"program module"** is given its **plain and ordinary meaning.**

## I. "system font table"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| a table of fonts in the system | user-accessible list, in the operating system, of fonts available to the operating system that is distinct from the temporary fonts directory, permanent system fonts, and system registration |

### 1. Analysis

The term "system font table" appears in claims 1, 6, and 11 of the '421 Patent. Defendant argues that the '421 Patent describes various locations for storing fonts and information about fonts. Dkt. No. 26 at 16. Defendant contends that its proposed construction should be adopted because it will assist jurors in understanding the distinctions between the various structures. *Id*. Plaintiff argues that Defendant's proposed construction would be confusing and unhelpful to a jury and that it impermissibly import limitations into the claims. Dkt. No. 27 at 18. The Court agrees with Plaintiff.

Defendant's proposed construction imposes a number of different requirements for the term "system font table," including: 1) a user-accessible list; 2) located in and available to the operating system; 3) distinct from the temporary fonts directory, permanent system fonts, and system registration. None of these requirements, however, are recited by the claims. *See, e.g.*, '421 at 16:30-32 (claim 1 describing "a system font table of the hand-held device is updated to reflect an availability of the external font files"); '421 at 17:28-29 (claim 6 describing "updating a system font table of the hand-held device to reflect an availability of the font"); '421 Patent at 18:26-27 (claim 11 describing "a system font table of the hand-held device to be updated to reflect an availability of the font"). The specification also does not support Defendant's proposed construction describing only that "[o]nce temporary font directory 507 is created, system font table 506 is updated to reflect the new temporary font files 312." '421 Patent at 13:57-59. Defendant

argues that this "availability" functionality requires that the "system font table" is accessible by users to determine which fonts the operating system has access to.  Dkt. No. 26 at 17.  The Court disagrees.[4]

The Court finds that Defendant's proposed construction is unsupported by the claims and the specification.  As its name suggests, a "system font table" is a table that relates to system font information.  The term's contextual use in the claims makes clear that the "system font table" is an electronic table that reflects the availability of fonts.  *See, e.g.*, '421 Patent at 16:30-32 (claim 1 describing "a system font table . . . reflect[s] an availability of the external font files"); *see also* 17:28-29 (claim 6 describing "a system font table . . . reflect[s] an availability of the font"); 18:26-27 (claim 11 describing "a system font table . . . reflect[s] an availability of the font").

Consistent with the self-defining nature of the term and its contextual use in the claims, the Court construes "system font table" to mean "an electronic table indicating the availability of fonts."

### 2.  Court's Construction

For the reasons set forth above, the Court finds that the term **"system font table"** is construed to mean **"an electronic table indicating the availability of fonts."**

### J.  "referenced"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| being downloaded with or linked with a network document | downloading the document also causes downloading of the file such as through corresponding tags, such as embedded tags or object tags, or other computer executable instructions |

---

[4] Moreover, Defendant's comparison with a "temporary fonts directory" that "may be" located so as not to be "directly accessible to a user" does not provide a sufficient basis to read "user-accessibility" into the claims for "system font table."  Dkt. No. 26 at 17.

### 1.  Analysis

The term "referenced" appears in claim 6 of the '421 Patent.  The parties agree that the '421 Patent expressly defines this term.  Dkt. No. 26 at 18-19; Dkt. No. 27 at 20-21.  The '421 Patent provides:

> In this description and in the claims, a file being "referenced" in a document means that downloading the document also causes downloading of the file such as through corresponding tags, such as embedded tags or object tags, or other computer executable instructions.

'421 Patent at 11:25-30.  Plaintiff argues that "referenced" is further defined in the '421 Patent at column 7, lines 40-42.  Dkt. No. 21 at 24.  Defendant argues that the additional passage Plaintiff points to is actually a definition for the term "network document," not the term "referenced."  Dkt. No. 28 at 12.  The Court agrees.  *See* '421 Patent at 7:38-42 ("As used here, the term *'network document'* is intended to mean any form of an electronic file that can have a display character embedded therein, attached thereto, referenced therein, such as through a link, or can otherwise be associated therewith.") (emphasis added).

In claim 6, it is a "font package" that is described as "referenced" by the network document, not a file.  '421 Patent at 17:6-9 (claim 6 describing "*a font package* separate from the application file of the network document and *referenced* by the computer executable instructions of the network document") (emphasis added).  As such, the Court's construction refers to the claimed "font package" and not a "file" as described in the '421 Patent specification.   The Court declines to include the examples from the specification describing how the referenced material may be downloaded (e.g., through corresponding tags, etc.) because the '421 Patent characterizes such examples as non-limiting.

### 2.  Court's Construction

For the reasons set forth above, the Court finds that the term **"referenced"** is construed to mean **"downloading the network document also causes downloading of a referenced font package."**

### K.  "download"

| Plaintiff's Proposal | Defendant's Proposal |
|---|---|
| copy or load | request over a network from a separate computer and receive on a local computer |

### 1.  Analysis

The term "download" appears in claim 11 of the '421 Patent.  Defendant argues that the '421 Patent "makes clear that 'downloading' involves a computer-to-computer transfer of information."  Dkt. No. 26 at 19.  Defendant further argues that the term is inapplicable to local data transfers within a single device, which Defendant contends Plaintiff's construction would allow for.  Dkt. No. 28 at 13.  Plaintiff argues that "download" is a commonly-understood term and that Defendant's proposed construction should be rejected because it imports limitations from the '421 Patent specification into the claims.  Dkt. No. 27 at 21.  Plaintiff argues that its "copy or load" proposal should be adopted because it taken directly from its extrinsic dictionary definition.  *Id*. at 22-23.

The term "download" is a commonly-understood term used in ordinary parlance.  Here, the meaning of the term is readily understood by its contextual use in claim 11.  Claim 11 describes a hand-held device and a second computer coupled to a network.  '421 Patent at 17:48-52 (claim 11 describing "[a] handheld device coupleable to a network . . . a second computer coupled to the network").  In describing the functional capabilities of the hand-held device, claim 11 recites "instructions" that when executed "enable communications between the hand-held device and the

second computer coupled to the network, download an electronic file from the second computer . . . ." '421 Patent at 17:57–18:1.  As such, claim 11 expressly describes that "download"—in the context of the claim—refers to transferring an electronic file from the second computer to the hand-held device, both of which are coupled to the network.  *Id.*  Given this express description of "download" in claim 11, the Court finds that no further construction is necessary.

### 2.  Court's Construction

For the reasons set forth above, the Court finds that the term **"download"** is given its **plain and ordinary meaning.**

## IV.    CONCLUSION

The Court adopts the constructions listed in the Claim Construction Order concurrent with this memorandum.  Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this memorandum is constrained by the Court's reasoning.  However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this memorandum that is not an actual construction adopted by the Court.  The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED** this 4th day of March, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE